Bolton *v.* De Peyster.

BOLTON and others *vs.* DE PEYSTER and others.

D. L., by his will executed previous to 1830, after giving to his wife certain articles of personal property, devised all his estate, real and personal, to his executors in trust; first, to pay his debts; secondly, to pay to his wife an annuity of $3000 half yearly, during her life; thirdly, in trust to raise the sum of $10,000 and to pay $5000 each to his two children, Louisa and Edward; and further in trust to raise the sum of $60,000, and to invest the same, and out of the interest and income of the same to pay the annuity to his wife, and if there should be any surplus, to re-invest the same, and suffer the said fund to accumulate during the life of his wife. And he directed his executors to apply the moneys they might receive, 1. To the payment of the annuity to his wife; 2. To the payment of $10,000 to his said two children; and 3. To the creation and investment of said sum of $60,000. After the payment of said debts, said legacies of $10,000, and the investment of said $60,000, he directed that *all the residue of his estate* should be divided into eight

equal parts. And he gave one part of such residue to his wife and her heirs, and one-eighth to each of his seven children, Louisa, Edward, James, Anastasia Lawrence, Dominick, Henry and Alexander, and their heirs. He directed that after the death of his wife one equal eighth part of said fund of $60,000 with the accumulations thereof, should be disposed of by his said wife by an appointment in the nature of a last will and testament, to and among his children and grandchildren, and in default of such appointment, the said one-eighth part should be divided in like manner as the residue of said sum. As to the other seven parts of said fund, (or the whole in default of such appointment,) after the death of his wife, he gave one equal part thereof to each of his seven children; and if either of them should die before his wife, leaving a child or children who should survive her, then such surviving child or children should take the share its or their parent would have been entitled to if living; and in case either of his children should die before his wife, leaving no child or children, then the share of the child so dying was to be divided among the survivors of his said seven children and the child or children (surviving his wife) of either of his said children, then dead, such grandchild or grandchildren to take the share its or their parent would have been entitled to if living. The testator declared that his intention in directing the investment of the said sum of $60,000 was "to provide beyond the possibility of accident," for the payment of the annuity to his wife; that he was aware that in raising that sum at once, a sacrifice might be necessary; and that should his wife be willing to accept, during her life, of certain parts of his real estate, which were productive, instead of the annuity, such an arrangement might be made. And he directed that the *residue* of his estate might *then* be divided as he had before directed. But that if such an arrangement or disposition was made, *it must be with the consent of all the parties interested.*

The testator left his wife and his seven children surviving him. Henry, one of his sons, died in 1846, leaving six children, the plaintiffs in this suit. J. L., the widow of the testator, died in 1849, having made a will, whereby she devised all her estate, real and personal, to her daughter Louisa. Alexander, another son of the testator, died in 1842, leaving no child. All the other children of the testator, except Dominick who had died leaving children, were living at the time of the death of the widow. The fund of $60,000 directed to be invested for the payment of the annuity to the widow, was never in fact raised or invested, but the widow's annuity was paid to her, from year to year, out of the rents and income of real estate of the testator at Rome.

In 1830 a bill in chancery was filed by a portion of the heirs and devisees of the testator against the others, the widow and the executors, stating that from the scarcity of money, a sale of the estate to raise the fund of $60,000 could not be made without great loss; that the widow, in order to prevent such sacrifice, had consented to an arrangement for the disposition of certain parts of the productive real estate, during her life; to which arrangement all the parties were willing to consent, to the end that the division of the estate

Bolton *v.* De Peyster.

might be completed. The bill prayed for a division of the estate upon a plan to be agreed on, under the direction of the court. The defendants appeared and filed their answers, and the cause was referred to a master to take proof of the facts, and to summon the parties to submit such an agreement as they were willing to make, touching the division of the estate. The parties accordingly entered into an agreement, and submitted the same to the master. Upon his report a decree was made by the court, for the division of the estate in conformity with the agreement and master's report, setting apart and conveying to James, Edward, Alexander and Henry, each, a certain part of the estate; directing the residue of the estate to be conveyed to trustees, to be held by them, subject to the payment of the annuity to the widow, &c.; and the residue to be held for the benefit of the widow, Louisa, Dominick, and D. L. Lawrence.

In an action by the plaintiffs, children of Henry, claiming that J. L. the widow, died without making any appointment, in pursuance of the will of D. L., and that they were entitled to one-sixth of the lands set apart and held by the trustees for the payment of the annuity to the widow, or to one-fourth of the sum of $60,000 with the accumulations thereof, held for the payment of said annuity,

*Held* 1. That had the $60,000 fund been created, and the directions of the testator in that respect complied with, upon the death of the widow without having made any appointment, Alexander having died before her, without issue, and Henry and Dominick having died leaving issue, the fund with its accumulations, should have been divided into six equal shares, to one of which the plaintiffs would have been entitled; the children of Dominick to another; James to another; Edward to another; Louisa to another, and D. L. Lawrence, in right of his mother Anastasia, to another.

2. That the will of Jane Lynch, the widow of D. Lynch, was a proper execution of the power of appointment vested in her as to one-eighth of the property or fund set apart to produce the annuity.

3. That her devisee, Louisa, took an eighth part of the fund or property thus set aside for the annuity, and the remaining seven-eighths parts were to be divided into six equal parts, of which the plaintiffs were entitled to an equal part or share; the children of Dominick to another equal part or share; James to another equal part or share; Edward to another equal part or share; Louisa, in addition to the one-eighth part which she took by virtue of the execution of the power of appointment by her mother, to another equal part or share; and Dominick L. Lawrence, in right of his mother, to another equal part or share.

4. That instead of the fund of $60,000 provided by the will, for the payment of the annuity to the widow, a substitution was made of productive real estate, by and with the consent of all the proper parties and those who were interested, by the suit in chancery; and that the real estate set aside to produce that annuity, and also for the share of the widow and her three children, in the residuum of the estate, was properly set aside for those purposes.

5. That the provisions of the testator's will relative to the disposition of the residuum applied to the substituted property, with the same effect that they would have had if no substitution had taken place. And that what remained after setting aside sufficient real estate to produce the annuity, was to be divided "as above;" that is, in the same manner and in the like proportions, as if no such substitution or change had occurred.

6. That a separation and division of the estate must be made, setting aside sufficient to place the widow and Louisa, Dominick and D. L. Lawrence, on an equality with James, Henry, Edward and Alexander; such division was to to be made as of 1831 as the time the sons received their share.

7. That whatever remained of the estate must be deemed as retained to satisfy the annuity; and that after it had fulfilled that office it must be divided in accordance with the terms of the will applicable to that fund.

8. That upon these principles the plaintiffs would be entitled to one-sixth part of seven-eighths of the residuum, with the accumulations, upon the death of the widow, deducting therefrom the annuity paid to her

THIS was an action by the children of Henry Lynch, deceased, to recover their alleged interest in a fund set apart by the will of their grandfather, Dominick Lynch, deceased.

Dominick Lynch died in June, 1825, being possessed of a large estate, real and personal. Previous to his decease he made and published, in due form of law, his last will and testament, whereby, after giving to his widow Jane, certain articles of personal property, he devised all his estate, real and personal, to his executors in trust; first, to pay his debts; secondly, to pay to his wife an annuity of $3000 a year half-yearly, during her life; thirdly, in trust to raise the sum of $10,000, and to pay $5000 each to his two children, Louisa and Edward, and further in trust to raise the further sum of $60,000, and to invest the same, and out of the interest and income of the same to pay the annuity to his wife; and if there should be any surplus, to re-invest the same and suffer said fund to accumulate during the life of his wife. And he directed his executors to apply the moneys they might receive, first, to the payment of the annuity to his wife; secondly, to the payment of $10,000 to his said two children; and thirdly, to the creation and investment of said sum of $60,000. After the payment of said debts, said legacies of $10,000, and the investment of said $60,000, he directed "*that all the residue of my estate*" should be divided into eight equal

Bolton *v.* De Peyster.

parts: and he gave one part of such residue to his wife and her heirs; one-eighth to his son Samuel and his heirs; one-eighth to his daughter Anastatia, wife of William Lawrence, and her heirs; one-eighth to his son Dominick and his heirs; one-eighth to his son Alexander and his heirs; one-eighth to his son Henry and his heirs; one-eighth to his daughter Louisa and her heirs; and one-eighth to his son Edward and his heirs.

After the death of his wife, he directed that one equal eighth part of said fund of $60,000, with the accumulations thereof, should be disposed of by his said wife by an appointment in the nature of a last will and testament, to and among his children and grandchildren; and in default of such appointment, the said one-eighth part should be divided in like manner as the residue of said sum.

As to the other seven parts of said fund, (or the whole in default of such appointment,) after the death of his wife, he gave one equal part thereof to each of his above named seven children; and if either of them should die before his wife, leaving a child or children, who should survive her, then such surviving child or children should take the share its or their parent would have been entitled to if living; and in case either of his children should die before his wife, leaving no child or children, then the share of the child so dying was to be divided among the survivors of his said seven children and the child or children (surviving his wife) of either of his said children, then dead, such grandchild or grandchildren to take the share its or their parent would have been entitled to if living. The testator declares that his intention in directing the investment of the said sum of $60,000 is to provide beyond the possibility of accident, for the payment of the annuity to his wife; that he is aware that in the raising that sum at once a sacrifice may be necessary. That should his wife be willing to accept, during her life, of certain parts of his real estate *which were productive, instead of the annuity*, such an arrangement may be made and may be beneficial; and he directs that *the residue* of his estate may *then* be divided as he had before directed. But nevertheless, if such

arrangement or disposition be made, *it must be done with the consent of all the parties interested.*

The testator left his widow and his seven children surviving him. Henry Lynch, one of the sons of the testator, died in October, 1846, leaving six children, the plaintiffs in this suit. Jane Lynch, the testator's widow, died July 2, 1849, having made a will, whereby she devised all *her* estate, real and personal, to her daughter Louisa Lynch. Alexander Lynch, another son of the testator, died in 1842, leaving no child. All the other children of the testator except Dominick, who had died leaving children, were living at the time of the death of his widow, July 2, 1849. The interest of Henry Lynch and Dominick Lynch in the estate of their father, by assignments made by them, became vested in James A. Hamilton, prior to 1830, and the interest of James Lynch had also been assigned to Seth B. Roberts.

In 1830 a bill was filed in the late court of chancery by James Lynch, Seth B. Roberts as assignee, Dominick Lynch, Alexander Lynch, Henry Lynch, Louisa Lynch and Edward Lynch, as complainants, against Jane Lynch and Peter A. Jay, as executrix and executor of the will of Dominick Lynch, and Dominick Lynch Lawrence, only child of Anastasia Lawrence, daughter of the testator D. Lynch, and the assignees of Dominick Lynch and Henry Lynch, setting forth the will of the testator. That the affairs of the estate had not been settled; that from the scarcity of money, a sale of the estate to realize sufficient to make the investment of $60,000, could not be made without great loss. That said Jane Lynch, in order to prevent such sacrifice, had consented to an arrangement to dispose of certain parts of said real estate, and that all the parties were willing to consent to such an arrangement of said estate for the division thereof as should be just, and which should receive the sanction of the court. In this complaint, in setting forth the contents of the will of Dominick Lynch, that part devising the residue of the fund to be created to secure the annuity with the accumulations to the child or children, if any, of his children who might die before his widow, and living at the time

Bolton *v.* De Peyster.

of her death, was omitted. The defendants Jane Lynch, Peter Augustus Jay and James A. Hamilton answered, the defendant Lawrence, an infant, not answering, or putting in only a general answer by his guardian ad litem. Mrs. Lynch, in her answer, states that she believes that the substance of the said will is truly set forth in the bill of complaint, but for greater certainty refers to the will itself.

Mr. Jay, in his answer, states that the original will is not in his possession, but he annexes what he thinks is a true copy thereof, and the same is contained in schedule A, annexed to his answer, and which he prays may be taken as part thereof, and refers to the same for the contents thereof. Mr. Hamilton, in his answer, states that the will is to the purport and effect as stated in the complaint, but for greater certainty refers to the original.

The cause was referred to a master in chancery by an order dated September 18, 1830, to take proof of the facts stated in the complaint, and to summon the parties before him to submit such an agreement as they were willing to make touching the division of the estate. *The parties to that suit* did enter into an agreement, and submitted the same to the said master. In such agreement they state that they are *the only parties in interest* in said estate, and that they preferred to divide the estate by setting apart and conveying to James Lynch a certain part thereof; by setting apart and conveying to Alexander Lynch a certain part thereof; by setting apart and conveying to Henry Lynch a certain part thereof; and that all the residue of the estate should be conveyed to trustees, to be held by them, subject to the payment of the annuity to Jane Lynch, and other charges which have since been paid, and the residue to be held for the benefit of Jane Lynch, Louisa Lynch, James A. Hamilton as trustee and assignee of Dominick Lynch, and Dominick Lynch Lawrence.

The master reports that he finds, on examination of the testimony and proofs submitted to him, that the material facts set forth in the original and supplemental bills are truly stated, as the same are therein set forth. He further reports, that

Bolton *v.* De Peyster.

in his opinion the plan of division contained in such agreement, and *agreed to* by the parties in interest as aforesaid, is, under all the circumstances of the case, the best that could be devised, and is for the benefit of said infant defendant.

A decree was made by the late court of chancery, on the 21st February, 1831, on the coming in of this report, in conformity with it. The decree directs the execution of said agreement, and the conveyance to the several persons therein mentioned, of the shares assigned to them. The shares were those to which James Lynch, Henry Lynch, Edward Lynch, and Alexander Lynch were entitled. And all the rest and residue of the estate was directed to be conveyed to trustees, to hold in one undivided share or interest, subject to the payment of the annuity to Jane Lynch, and also subject to other claims, which have been liquidated, and subject and for the benefit of Jane Lynch, the widow, Louisa Lynch, James A. Hamilton assignee of Dominick Lynch the younger, and Dominick Lynch Lawrence, share and share alike. The decree directed Mr. Jay and Mrs. Lynch to make such conveyances, and to convey the said undivided share to Frederick De Peyster and Jane Lynch, to hold the same upon the trusts mentioned in said decree.

The plaintiffs claim, by their complaint, that Jane Lynch died without making any appointment in pursuance of the will of Dominick Lynch, and that they are entitled to one-sixth of the lands set apart and held by the trustees for the payment of the annuity to Jane Lynch, or to one-fourth of the sum of $60,000 with the accumulations thereof, held for the payment of said annuity. All the parties claiming an interest in the estate of Dominick Lynch the elder, seek to maintain the division of the estate as made by the decree of the late court of chancery, in 1830, as the same is now discharged of the annuity to Jane Lynch, except the plaintiffs, children of Henry Lynch deceased.

A decree was made at special term, in February, 1854, dismissing the complaint without costs; and from that decree the plaintiffs appealed to the general term.

Bolton *v.* De Peyster.

*W. Hutchins* and *G. Wood*, for the plaintiffs. I. Under the will of Dominick Lynch, the children of the respective children of the testator took a contingent interest in the share of their parent, in the fund of $60,000 to be set apart to raise the annuity of $3,000 for the widow; and the surplus accumulated beyond the annuity of the widow; also in the one-eighth of said fund given to the widow, and not disposed of by her under the power, which interest vested in them absolutely in case the parent died in the lifetime of the widow.

II. Such a limitation was valid, and warranted by law.

III. The parties interested could, under the will, make an arrangement with the widow (she being willing so to do) for her to accept during her life certain productive parts of the real estate *directly*, instead of raising out of the real estate the personal fund of $60,000.

IV. The property thus substituted, must under a sound construction of the will, be subject to the same limitation as the proposed fund under the will was subject to, and the grandchildren took the same rights therein. (1.) The testator meant that the fund set apart for raising the widow's annuity with the accumulations of the surplus income beyond the annuity, should after her death go in equal shares to the children surviving her and to the children of a deceased child not surviving her, as limited in the will. (2.) This limitation to surviving grandchildren was an independent provision for their benefit. (3.) This limitation was not a necessity resulting from the setting apart a *personal* fund to raise the annuity, because the remainder in fee in that *personal* fund might have been limited to and vested in the children of the testator at once, as well as his other property. (4.) Whether the fund set apart to raise the annuity was real or personal, it was susceptible of the same limitation in remainder. (5.) No limitation is provided in the will for the estate in remainder after the death of the widow if the fund be *real*, different from the limitation applicable to it as a personal fund. (6.) "*The residue*," after setting apart land instead of a personal fund, to be divided as above directed, under the words in the 18th folio, means that the residue of

his property, beyond those lands, and not the remainder in fee in those lands, should be at once divided, and that the remainder in fee should be divided or disposed of *after her death ;* that being the prior direction referred to in that part of the will. (7.) To raise the fund of $60,000, real estate could have been set apart and converted into money, whereas, under the arrangement assented to, *productive* real estate is set apart *directly* for this purpose, and not converted into money. (8.) The alteration effected by such arrangement is a mere substitution of a different mode of setting apart and applying property. (9.) The substitution of a different fund, or a different mode of raising it, will not *per se,* change the character of the limitation or disposition, but will be impliedly subject to the same disposition and the same general purpose. (*Lorillard* v. *Coster,* 5 *Paige,* 172.)

V. The only right the parties interested had was to set apart certain parts of the testator's real estate, which was then productive, instead of the annuity, and the *residue* of the estate should then be divided as the residue was to have been divided, in case the sum of $60,000 had been set aside for an annuity. The arrangement which was made was not authorized by the will. (1.) Certain parts of the productive real estate which was separate and distinct from the rights and interests of others, were not set apart to her use during her life. (2.) The *residue* of the. estate was not then divided in the manner specified in said will, that is one-eighth to each of the persons mentioned. (3.) A part of the productive real estate was set aside to her use for life, which at her death was to be divided, three-fourths to the children and one-fourth to her heirs, and the residue was divided amongst four of the children, one fourth to each. (4.) The arrangement which was made took away the powers given to the executors as trustees, and substituted others as trustees for purposes different from those contemplated in the will.

VI. The parties, as stated in the bill, actually set apart real estate in order to raise the widow's annuity described in the bill, and made the same subject to said annuity, which was carried out in the chancery suit and decree described in the bill, but they omitted to secure to the children of Henry Lynch

their contingent rights in their share of the real estate convert-ed into the fund of $60,000, and such grandchildren are not bound, not having been made parties.

VII. The plaintiffs are entitled to one-sixth of the whole of the real estate thus substituted, viz : (1.) The plaintiffs, on the death of Henry, in the lifetime of the widow, were entitled to one-eighth of said land. (2.) The will of Jane Lynch, mention-ed in the answer, is not an appointment of one-eighth of the said $60,000, or of the land in lieu thereof, and for want of such appointment, the plaintiffs are entitled to one-sixth of said one-eighth of said land. (3.) By the death of Alexander and of Jane, the widow, as above stated, the plaintiffs are entitled to one-sixth of one-eighth of their respective shares or rights, which, in addition to the one-eighth above mentioned, is equal to one sixth of the whole of said lands.

VIII. And they are entitled to the land instead of the money, because the widow was willing to accept and did accept the same, and it was for the general interest of the estate that said real property should be set apart for her annuity instead of the con-version of the same into a personal fund ; the defendants, by their acts and proceedings, having prevented the investment thereof into money, and assented to that arrangement.

IX. The parties to that stipulation had a right to substitute productive real estate instead of converting it into the per-sonal fund ; they could not deprive the grandchildren of their contingent rights therein, and those rights still exist in the land. (1.) The contingent rights of the grandchildren were independent of the limitation to the children. They take as purchasers from the testator, and not in representation from the children of their respective parents. (2.) Assuming that such of the parties in interest as were competent to act, and were not under a personal disability, could, upon a sound con-struction of the will, make by their assent a valid substitution of a productive real fund, they could not thereby change the character of the limitation, and deprive the grandchildren of their rights therein. (3.) The rights of the grandchildren, until the death of their parent before the widow, were contin-

gent. They had no estate except in possibility, all which was inalienable by them, if they had been of age, and *a fortiori*, they were inalienable by their parents.

X. Assuming the assent of the grandchildren, as unnecessary, yet the arrangement entered into in the suit for the division of the estate in 1831 is void, because not made with the consent of all parties interested, as directed in the will. (1.) Henry Lynch had not such an interest as authorized him to consent. His interest in his father's estate was in the United States. His assignee had not such interest. He was not cognizant of the arrangement made by James and Henry in regard to the debt. The United States did not assent to it by the secretary of the treasury. (2.) Dominick Lynch had no such interest, and for the same reason. His children, who are defendants now hold this estate on the sole ground that they were the parties in interest ; having gained a valuable estate on this ground, they are estopped from alleging that their father was the party competent to contract. (*Dennis* v. *Cornell*, 3 *John. Cas.* 174. 9 *Cowen*, 274. 9 *Wend.* 147. *Congressional Documents*, 1835.) So far from Henry Lynch having had his share of the whole estate, including that part of the $60,000 to which he would have been entitled had he survived his mother as is alleged in the answer, it is apparent from the testimony of the defendant, Roberts, that neither he nor his assignee received the portion to which he was entitled before the death of his mother. (1.) According to Bennett's testimony, not called in question, Louisa received for her one-eighth of the estate, land situated in Rome, worth $62,500 at the time of division, and now worth $125,000, and D. L. Lawrence the same, and the children of Dominick, the same. (2.) Henry Lynch's one-eighth was subject for the most part to contracts, and sold under the contracts for $800, including the $12,000 debt, it was worth not over $20,000, and it consisted of grazing and farm lands, not likely to increase in value.

XII. The land set apart, with all its increased value, is subject to the limitations and dispositions in favor of the children of Henry Lynch, and if it had depreciated in value, they must have borne the loss.

Bolton *v.* De Peyster.

*M. S. Bidwell*, for the defendant De Peyster. I. No cause of action was established in favor of the plaintiffs, or any of them, against any of the defendants. The testator, by his will, gave his widow an annuity; and for the purpose of providing *"beyond the possibility of accident"* for the payment of this annuity, he directed a fund of $60,000 to be set apart. That this was the object which he had in view, in making this provision for a fund, is not left to conjecture, or even to inference, for it is expressly declared by the testator himself, in his will. As to the residue of his estate, he made provision for the disposition of it immediately on his death; all of it, with the exception of that fund, was to become at once the vested and absolute property of certain designated persons. But a different provision was of course necessary in respect to this fund. Something must be done with it when the object for which it was created, namely, payment of the annuity, should cease. The contingent interests in favor by possibility of grandchildren, were incidental, or rather accidental, and not primary objects. They were incidental to the creation of the fund, but were not at all an object for which it was to be raised. A bounty to the grandchildren was not at all the object of the testator in creating the fund. He wished merely to secure the annuity to his widow "beyond the possibility of accident." It is very evident, therefore, that when the testator authorized a different arrangement to be made, "instead of the annuity," with the consent of all parties interested, he meant, by the "parties interested," the widow and the children named in his will, and those persons only. The widow was clearly interested, and so were the children, for two reasons: Any other arrangement would require them to give up, first, for the widow's life, some of the property given to them by the will; or, in the language of the will, it would require an arrangement or disposition of his property to be made different from that which he had previously made; secondly, to give up their interest in the fund. The children of the testator's children were not persons whose consent was necessary to such an arrangement. They were not interested, and never could be, unless two contingencies hap-

pened, namely : First, unless their parent, who was the testator's child, should die before the widow ; and secondly, unless they themselves should survive her. They had a mere possibility, not an interest. (*Edwards* v. *Varick*, 5 *Denio*, 664. *Jackson* v. *Waldron*, 13 *Wend.* 178. *Pelletreau* v. *Jackson*, 11 *id.* 110.) The testator's children had a vested interest in such fund, although it was liable to be divested by their death during the widow's life. (*Nodine* v. *Greenfield*, 7 *Paige*, 545. *Williamson* v. *Field*, 2 *Sandf. Ch. R.* 533. *Shepherd* v. *Ingram*, *Ambl. R.* 448. *Skey* v. *Barnes*, 3 *Mer.* 335. *Hervey* v. *McLaughlin*, 1 *Price*, 264.) The testator's children, but not *their* children, were, with the widow, " the parties interested," whose consent was required as a condition to the contemplated arrangement. Such is the legal import and effect of this provision of the will ; and such, undoubtedly, was the intention of the testator. In requiring the consent of all parties interested, he could not have intended to require the consent of all who might possibly, under certain contingencies, become interested at an uncertain future period ; because, until the death of his widow, it could not be determined who might become so interested ; and because, even if no other grandchildren than those living at his death were included among the parties interested, the testator must have been aware that they would, be infants, incapable of exercising a judgment or giving any legal consent to any arrangement ; and because the contemplated arrangement was to be made, if at all, immediately after his death, as it was intended to prevent the raising of the sum of $60,000, which, if such an arrangement was not made, was to be one of the first acts and duties of the executors. It was an arrangement to be made before the division of the estate. Every instrument should receive a reasonable construction ; but a construction that would require the consent of all those who might possibly become interested in the fund would not be a reasonable construction ; on the contrary, it would be perfectly absurd ; it would nullify and stultify the whole provision for making such substitutional arrangement.

II. But if such a construction should be adopted, the conse-

Bolton *v.* De Peyster.

quence would not be that the plaintiffs have any right to, or interest in the property mentioned in the trust deed; that property was not given to them; it belonged to the testator's widow and children, and the neglect of the executors to raise the fund of $60,000 could not give the plaintiffs a right to that property. Such neglect might be a breach of trust, for which the plaintiffs might maintain a suit against the executors, and perhaps against the legatees who received the assets out of which that fund should have been raised. But that would be a very different action from this. In no form, however, could they maintain an action against the defendant, De Peyster, who is a trustee appointed by the court, and who has been unnecessarily and vexatiously dragged into a litigation about matters in which he had no concern.

III. There is no ground at all for the idea that the property mentioned in the deed was a substitute for the fund of $60,000, and that the plaintiffs have the same rights in it that they would have had in that fund. The parties to the deed never contemplated such a thing, and it would be impossible to give to the deed such a construction and effect, without the utmost violence to its language and palpable meaning, and without an entire and wanton disregard of the evident intention of the parties. Such a construction would assume, too, in opposition to the whole frame and tenor of the plaintiffs' case, that the arrangement *was* made with the consent of all parties interested, and that it was not (as the will authorized) an arrangement "instead of the annuity," but an arrangement in place of the fund. But the deed cannot, by any ingenuity, be tortured into any such meaning or effect, and if the parties to it did not intend that it should have such an effect, there is no ground upon which the court can give to it such an operation. If the plaintiffs claim *under* the *deed,* they can take nothing which the deed does not give to them. If they do *not* claim under the deed, then they must show some other title to the property. It is quite clear, in such a case, that they have no cause of action against the defendant De Peyster. It is not a case of a trust by operation of law, as it would be if property to which the plaintiffs were

entitled had been wrongfully converted into this property; on the contrary, the property mentioned in the deed always, after the testator's death, belonged rightfully to the parties to the deed, and to them alone.

The judgment should be affirmed, as to the defendant, De Peyster, and as he is a trustee, and in fact a trustee appointed by the court, it should be affirmed, as to him at least, with costs.

*Charles Tracy,* for Maitland and wife and Dominick Lynch. I. The main design or principal intent of the testator, in directing the formation of a fund of $60,000 in personal property, was to insure the full and punctual payment of the annuity he left to his widow. This intention is expressly declared in the will, and no other can be implied or inferred. The annuity was not dependent on the personal fund, nor incidental to it. The annuity began to run immediately on the testator's death, and was a charge on his whole estate until a personal fund of $60,000 should be raised and set apart to secure the annuity, when the estate at large would be discharged of the duty to pay the annuity and become capable of immediate distribution. If the personal fund was never raised, the whole estate would remain charged with the annuity. The scheme of an annuity fund was an expedient to render the payment sure and prompt, while it would liberate the estate from the general charge to furnish the annuity. It was a wise measure for accomplishing his main design, without prejudicing the natural wish of this wealthy man to have his estate so administered as to suffer no diminution, but to be preserved to his family in its full dimensions. (2 *Jarman on Wills,* 280. *Ram on Wills,* 100. 3 *Bradford,* 53.)

II. The provisions for a distribution of the personal fund, after the death of the annuitant, were merely incidental to the existence of such a separate fund; and no such fund having ever been formed, those provisions never became operative. (*Ram on Wills,* 100.) The testator provided that upon such personal fund being set apart, the residue of his estate should

Bolton *v.* De Peyster.

be divided among his heirs named; and when the annuitant should decease, the residue of the fund should be divided in like manner; the only difference being his guarding against changes by lapse of time, by admitting descendants of deceased children to take their parents' share. This feature, of a second division of property, naturally arose from the plan of setting apart a fund for the life of the widow. Such fund must be kept together, and ought not to be embarrassed with a diversity of owners, claiming severally as shareholders in the fund, by virtue of a division of it in remainder. It was best for the annuitant to have the fund belong to the undivided estate and remain in the absolute power of the executors during her life, and no question of its final distribution arise until after her death.

III. The testator, anticipating the difficulty of raising the annuity fund, further provided for an alternative arrangement, by which the whole annuity might be compounded for, and the necessity of an annuity fund might cease. This alternative provision was that the widow might have productive lands for her life, instead of the annuity. The testator's language is unequivocal; the life estate in lands was not a substitute for personal property in an annuity fund, nor a collateral security for a current annuity; but it was a full substitute for the annuity itself, which thereby became dispensed with altogether. An adoption of this alternative provision must extinguish the annuity, and with it the incidents of the annuity, namely, the annuity fund, if any was formed, and the ultimate distribution of the residue of said fund. In harmony with this view, the testator authorizes that the whole residue of his estate be immediately divided and distributed, upon the adoption of this life estate in lands in lieu of the annuity. The annuity being out of the way, there would be no obstacle to the immediate closing up of his estate. The reversions or remainders in those lands out of which the widow's life estate was taken, were convenient and available for this final distribution to his heirs.

IV. The will is in harmony throughout. The testator's first care was to secure a proper support for his widow. He there-

fore not only gives her one-eighth of his whole estate, but leaves her an annuity, and leaves his whole estate chargeable with its payment, until a personal fund of $60,000 shall be set apart to secure this annuity; but foreboding that the raising of such a fund might greatly sacrifice his property, he provides for that contingency by authorizing the substitution of a life estate in productive lands in lieu of the annuity, by consent of the widow and the heirs. His second care was for his children; and he gives the rest of his estate to them, directing that the distribution be made upon the annuity question being disposed of, either by setting apart the annuity fund or by substituting a life estate in land in lieu of the annuity. In the former case the distribution could not include the annuity fund, and that fund must await the death of the annuitant, and consequently a particular direction was given for that case, if it should occur, with provisions adapted to changes in the family by lapse of time.

V. There is no ground for the plaintiffs' claim, that upon adopting the alternative provision of the will, the lands out of which the life estate was carved became in fee the annuity fund itself. The will recognizes no annuity fund but one composed of a certain class of personal property. It admits of no investment of the fund in lands. It does not allow the taking of lands in lieu of personal property in forming the fund. The substitution of lands in this fund, in any form, would be a clear breach of duty in the executors. The will contains no directions for an ultimate distribution or division of real estate held as annuity fund. There is no conversion of the realty into personalty by this will. (*Leigh & Dalzell on Conversion*, 15, 2.)

VI. The division of the property directed by the will to be made on the substituting of a life interest in lands in lieu of the annuity, is a division of the whole estate, and includes the remainders or reversions in the lands themselves. The terms used are decisive. It is " the residue of the estate ;" and it is to be " divided as above directed," referring to a division of the whole property. This plan of final division, immediately after the carving out of a life estate, furnished a motive to the widow to accept the life estate in lieu of the annuity, for it gave her abso-

lutely one-eighth of the remainder in fee, instead of leaving her a power to appoint one-eighth of the annuity fund by her will, which was some compensation for taking the hazards of obtaining from the life estate a regular and prompt income equal to the annuity.

VII. " The consent of all parties interested," which is requisite for substituting a life interest in lands in lieu of the annuity, must consist of the consent of the widow, and the seven heirs named in the will, or their heirs living at the time the change was made. Such is the obvious construction of the will, which gives the estate mainly to the widow and the seven children named, and every where presents them as the parties interested. The issue of those seven children, born or to be born, could have no interest until the death of their respective parents. All that could be predicated of them during the life of their parents and of Mrs. Lynch, their grandmother, was a bare possibility of a future interest, and not an actual present interest. Their case would be thus : if the annuity fund should be formed, and if their grandmother should outlive their parents, and if they should outlive their grandmother, and if there should be a remnant of the fund at her death, then they would be entitled to a share ; but in default of any one of the conditions stated, they would take nothing. This construction is also necessary to give effect to the alternative provision of the will; for the consent of the issue of the children named could not be obtained, there being at all times a possibility of further issue, and infant issue ; and nobody can consent for an infant or an unborn child ; consequently the provision which was intended to be beneficial, and was well adopted to that end, must wholly fail.

VIII. The proceedings to effect the change from an annuity to a life interest in lands, were had in perfect conformity to the will. The executors waited four years, and by a full trial and experience knew that the change was necessary. The widow and the seven children, all being in life, consented. The jurisdiction of the court of chancery was invoked. The executors, the widow, and all the children, became parties to that

suit. The condition of the estate was fully exhibited to that court. The will at large was laid before the chancellor. A decree was entered confirming the change, and conveyances were executed accordingly.

IX. The defendants Stuart C. Maitland and Margaret his wife, and Dominick Lynch, (the third of the name,) derive title by descent from Dominick Lynch, (the second of the name,) one of the sons of the testator, to whom a share in the Rome lands went as his portion on the division of the estate. The plaintiffs claim as issue of Henry Lynch, who united in the arrangement of 1829, was one of the plaintiffs in the chancery suit by which that arrangement was established, and obtained his full share of the estate. The court should be slow to aid one branch of the family in seeking to redivide the portion of another branch, when both were portioned equally; especially when the plaintiffs attempt this spoliation by impeaching the contract of their parent, and the solemn decree of the court of chancery, made on the prayer of his bill more than a quarter of a century ago.

*B. D. Silliman,* for the defendants Luquer and Pringle. I. The great object of the testator was to secure, " beyond the possibility of accident," the punctual payment of the annuity of $3000 to his widow, and then that the residue of his estate should be divided among his children. He therefore directed the sum of $60,000 to be raised and invested, and the interest and income thereof applied, in the first place, to the payment of such annuity; and while he foresaw that to raise this sum would sacrifice his estate, still he determined such sacrifice should be made, unless, (1.) The widow was willing to accept certain parts of his productive real estate for life, instead of the annuity; or (2.) Some different arrangement or disposition of his property should he made, by and with the consent of all parties interested; and upon either being done, the remainder of his estate should be divided without unnecessary delay.

II. If the testator had his grandchildren in mind, it was only in connection with the $60,000 fund (if raised) for the

Bolton *v.* De Peyster.

widow's annuity, which was to be superseded either by her accepting productive real estate, in lieu of such annuity, or by the parties then interested making some different arrangement and disposition of his property. It was not his intention to have any portion of his property saved for distribution among them. So far as they were concerned, a mere remote contingency could give them an interest in the fund of $60,000, should such fund be raised. But if land should be taken, then the fund was not to be raised; and the only contingency in which they could have an interest was precluded. It is no answer to say that it was unreasonable for the testator to have reference to his grandchildren in the one case and not in the other. It certainly was competent for him so to frame his will and dispose of his property, and there is nothing in the case indicating any intent to provide for them.

III. The direction by the testator that any arrangement, &c. "must be by the consent of all parties interested," did not refer to the arrangement by which real estate might be taken in place of the fund of $60,000. It was intended to provide that if any arrangement should be made other than the alternative arrangement which he had named, (i. e., either a fund of $60,000, or the acceptance of real estate instead of the annuity,) such other arrangement "must be made by the consent of all parties interested," and not by any arbitrary arrangement between the widow and the executors.

IV. Even if it was intended that the alternative arrangement (by which land might be taken instead of money,) should be only on such consent, then the "parties interested" were the widow and children of the testator, who, at his death, would be the only parties capable of assenting. The testator did not contemplate having the assent of grandchildren who might then be unborn, or infants incapable in law of giving a binding assent. The construction claimed by the appellants, that the arrangement could not be made without the consent of those who by possibility might become interested, would make it impossible to carry out the testator's intent as to the acceptance of land instead of money. As unborn grandchildren could not

be made parties, the requisite "consent" would necessarily be unattainable. Such arrangement (on the appellants' assumption) could be at no time made, because grandchildren might be born after any arrangement, and thereby defeat it.

V. The arrangement and partition of the estate which was made by and between the widow and children, ratified and carried into effect by the decree of the court of chancery, was a valid arrangement and settlement of the estate under the will, and was and is operative and binding upon all the parties thereto, and cut off every possible and contingent future interest which the plaintiffs and the other grandchildren had. (1.) It is not pretended there was any fraud or undue influence used to bring about the arrangement, and all the proceedings in the action were regular, and are affirmed by the complainants in this action, so far as respects the share given to Henry Lynch. (2.) The plaintiffs could not, if then living, have been made parties to that action, because they had no right or interest in the estate. They had nothing more than a naked possibility dependent upon the death of their father in the lifetime of the widow, and upon their surviving him and her. (*Pelletreau* v. *Jackson*, 11 *Wend.* 121. *Jackson* v. *Waldron*, 13 *id.* 178, 212, 214, 221. *Varick* v. *Edwards*, 1 *Hoff. Ch. R.* 401. 1 *Prest. on Est.* 75, 6. 4 *Kent's Com.* 261, 2.)

VI. The lands conveyed under the decree of the court by the executors of Dominick Lynch, to Jane Lynch and Frederick De Peyster, subject to the charges· and incumbrances imposed thereon, were the aggregate shares and interests of Mrs. Lynch, Dominick Lynch, Louisa Lynch and Dominick Lynch Lawrence, in the estate, and were accepted by them in full satisfaction and discharge of the devises and bequests to them respectively. The children of Henry Lynch have no interest in, or title to, the premises so conveyed to Mrs. Lynch and Frederick De Peyster. It is inequitatble for them to claim any interest therein after their father had received his full share of the estate.

*E. H. Owen*, for the defendants Louisa Lynch and D. L. Lawrence. I. The main idea of the testator was, after provid-

ing for paying his debts, to secure, beyond any contingency, the punctual payment of the annuity of $3000 to his widow, and to divide the residue of his estate among his children. He therefore directed the sum of $60,000 to be raised and invested, and the interest and income thereof applied, in the first place, to the payment of such annuity; and while he foresaw that to raise this sum would sacrifice his estate, still he determined that such sacrifice should be made, unless, (1.) The widow was willing to accept certain parts of his productive real estate for life, instead of the annuity; or, (2.) Some different arrangement or disposition of his property should be made, by and with the consent of all parties interested; and upon either being done, the remainder of his estate should be divided without unnecessary delay.

II. It was not the intention of the testator to make any provisions for his grandchildren. If he had them in mind, it was only in reference to the raising and investing the $60,000 for the widow's annuity, which was to be superseded either by her accepting productive real estate, in lieu of such annuity, or by the parties interested making some different arrangement and disposition of his property. It was not his intention to have any portion of his estate saved for distribution among them.

III. The " parties interested," to whom the power of making a different disposition of his estate was given, were the widow and children of the testator, who, at his death, when such arrangement was to be made, would be the only parties capable of assenting. The testator did not contemplate having the assent of grandchildren who might then be unborn, or infants incapable in law of giving a binding assent; and a construction which would include them within that term would be unnatural and necessarily frustrate the design of the testator of having a speedy division of his estate after his death.

IV. and V. Same points as the Vth and VIth of B. D. Silliman.

VI. The will of Mrs. Lynch was executed in due form of law, and was a valid execution of the power given to her by the will of Dominick Lynch. It was not necessary that her

will should recite the power of appointment.  (2 *R. S. last ed.* 146, §§ 137, 138.   *Old ed.* 737.)

*By the Court,* DAVIES, J.   A perusal of this will must carry with it the conviction that the first object of the testator's boun- ty and solicitude was his wife.   Her comfortable support for life, without the possibility of accident, was his chief concern. It is apparent, we think, that he regarded his children, in com- parison with what he deemed due to his wife, as secondary ob- jects of his consideration.   It would appear from his will, that he had already made some provision for them, and that he gave to his children Louisa and Edward each $5000, "they having as yet received nothing from me, beyond their education and support."   From this it might be inferred that the others had received at least an equal amount.   Keeping in view there- fore, what we think is apparent from the whole tenor of this will, the anxiety of the testator to secure an adequate and com- fortable support for his wife during her life, irrespective of any supposed claims of his children, we perceive that she is first to receive out of his estate an annuity of $3000.   To secure that, a sufficient portion of his estate was to be sold, and the whole if necessary, and the proceeds to the extent of $60,000 invested in bonds and mortgages, or in stocks of the United States or of the state of New York, and from such interest and income the annuity was to be paid.   The testator supposed that such fund might produce more than sufficient to pay the annuity, and he directs his executors to re-invest the surplus and accumulate the same during the life of his wife.   After the death of his wife, he directs that one-eighth part of said sum of $60,000 with the accumulations thereof, be disposed of by his wife, by appoint- ment to and among his children and grandchildren, and in de- fault of such appointment the same to be disposed of as he directs as to the other seven-eighths parts of said fund.   Of the other seven-eighths parts of said fund after the death of his wife he gives one equal part to each of his seven children, and in case either of his children should then be dead leaving issue, the child or children of such child to take the share or part of its or their

Bolton *v.* De Peyster.

parent, and if any of his children should have died, leaving no child or children, then his share was to be divided among his surviving children, and the child or children of any deceased child, *per stirpes,* and not *per capita.*

Here we see that the testator, after securing for his wife in the most perfect manner, and in the way best calculated against the possibility of accident, the support which he deemed adequate, his next objects of care and solicitude were the children who might be living at her death, and the grandchildren who had lost their parents. This fund he knew would be adequate for his wife for her life. After that first desire of his heart had been fulfilled, he intended that something should remain to be divided among his children or the children of such as should have deceased. We cannot shut our minds to the conviction that the objects of the testator's care and bounty were prominently in his mind, and we should do violence to his intentions and the language used by him, if we did not give effect to the one, and due weight to the other. Bearing in mind what we think is apparent from this will, that the testator had made some provision for all his children, and that he was well aware of the vicissitudes of commercial life and the uncertainty that his children would retain for their support in the evening of life, or for their children, that which might be given to them absolutely, the testator deemed it best in order to secure their enjoyment of at least a portion of his estate, that this was the wisest disposition to make of it. Whether wise or unwise, it is the duty of this court to give to his intentions, when ascertained, their full force and effect. We have no power and we trust no disposition, to make wills for others, and feel that our whole duty is discharged in carrying out fairly and truly the language and true import of those we are called upon to consider.

Assuming, therefore, that this view is correct, and that this fund had been created and the directions of the testator in this regard complied with, how would the rights of the parties to this suit have stood upon the death of Mrs. Jane Lynch, in respect thereto? In default of any appointment by her, Alexander Lynch having died before her, without issue, and Henry Lynch

and Dominick Lynch having died, each leaving issue, this fund with its accumulations should have been divided into six equal shares, to one of which the plaintiffs, children of Henry Lynch, would have been entitled; to another sixth part the children of Dominick Lynch; James Lynch to another sixth part; Edward Lynch to another sixth part; Louisa Lynch to another sixth part; and Dominick Lynch Lawrence, in the right of his mother, to another sixth part.

By the revised statutes in reference to powers, it is provided, (1 *R. S.* 737, § 126,) that lands embraced in a power to devise shall pass by a will purporting to convey all the real property of the testator, unless the intent that the will shall not operate as an execution of the power shall appear, expressly or by necessary implication. A perusal of the will of Jane Lynch shows that it is a disposition of all her real property, and certainly no intent is expressed in the will that it shall not operate as an execution of the power of appointment vested in her as to one-eighth of the property or fund set apart to produce the annuity. Neither can an implication necessarily be derived from the will, that it was not equally the intention of the testatrix that her will should not operate as an execution of the power. It must therefore be determined that the devisee of Jane Lynch took an eighth part of the fund or property thus set aside for the annuity, and the remaining seven-eighths parts, are to be divided into six equal parts, of which the plaintiffs are entitled to an equal part or share; the children of Dominick Lynch to another equal part or share; James Lynch to another equal part or share; Edward Lynch to another equal part or share; Louisa Lynch, in addition to the one-eighth part which she takes by virtue of the execution of the power of appointment by her mother, another equal part or share; and Dominick Lynch Lawrence, in right of his mother, to another equal part or share.

We come now to the consideration of the question whether there is any fund or portion of the estate of the testator to which these provisions of the will attach and are applicable? It is quite clear that the original design of the testator to convert sufficient of his estate into cash and thereby create a fund of

$60,000 was not carried out. If any fund for the production of the annuity was created, it was a substitution of productive real estate instead of the cash derived from a sale, sufficient to produce and secure the annuity. Such alteration is a mere substitution of one species of property for another. The substitution of a different fund or different property will not *per se* change the character of the limitation or disposition, but will be impliedly subject to the same disposition and the same general purpose. (*Lorillard* v. *Coster*, 5 *Paige*, 172.) If therefore it shall be found, on examination, that a fund has been created to supply the place of the money to be raised, it follows that the provisions of the testator's will, relative to the disposition of the residuum, apply with the same effect to the substituted property, that they would have had if no substitution had taken place.

It is contended on the part of some of the defendants that no such fund has been created; that if the executors violated or neglected their duty in not creating it, they are liable for a breach of trust; and they not being made parties to this suit, there is a defect of parties, and the complaint must be dismissed. In the view we take of this case, it will be seen that we do not think there has been any breach of trust on the part of the executors; that consequently no claim could be properly made against them, and that so far as they are concerned, there is no want of proper parties.

The testator directed that after the payment of his debts, the legacies to his two children, and after the investment of the $60,000 fund, *all the residue* of his estate, real and personal, should be divided into eight equal parts, and he gives one share to his wife, and another share to each of his children absolutely. We see by the language used by the testator, and the disposition made of this fund after the death of his wife, that he did not embrace it in the residue of his estate given absolutely to his wife and children. In this fund his wife was to have no share, except the annuity to the extent of $3000 for her life. After her death it was to go to his surviving children or grandchildren.

It seems to us, therefore, that it is the manifest and apparent

intent of the testator, throughout the whole scope of his will, to set apart this fund for a peculiar purpose, and after that was fulfilled, to make a disposition of it different from that which he made as to the other portions of his estate. New objects of his bounty were to be provided for, and those perhaps who he deemed had peculiar claims to his attention and sympathy. He chose to make the distinction, and it is not for us to say it was unnatural or unwise.

The testator, foreseeing, or as one of the counsel on the argument felicitously expressed it, foreboding that a sale of his real estate to raise the sum of $60,000 in cash, might produce a great sacrifice of property, and materially injure his children, who were to take the residue, declares that his intention in directing the above provision of $60,000 to secure the annuity, was to provide beyond the possibility of accident for the punctual payment of the annuity of $3000 a year to his wife during her life, and being aware that in order to raise that sum *at once*, a sacrifice might be necessary, he then directs that if his wife should be willing to accept certain parts of his real estate *which were then productive*, instead of the annuity, such an arrangement might be made, and might be beneficial. What was the object of this contemplated change or substitution? To prevent a sacrifice by a sale *at once*, of sufficient to raise $60,000. When that fund was raised it was to be invested, so as to be made *productive*. It was the product or income to which the testator looked. That was to furnish the annuity, and he declared that if his wife was willing to accept in lieu of this fund, real estate then *productive*, in other words yielding an income, instead of the income to be obtained from the money invested, she might do so. The product of the real estate was substituted for the interest or income of the $60,000 invested. She was to have, in any and all events, $3000 a year during her life, and the parties never contemplated that she was to have any more or less. We see by the decree made in the chancery suit, that the real estate conveyed to the trustees was subject to the payment of the annuity of $3000 a year. It appears also from the testimony of Roberts, that the annuity

of $3000 a year was paid to Mrs. Lynch out of the proceeds of the Rome estate. All the parties have therefore properly treated this estate as that from which the annuity was to be paid, or that from which it was to be produced. Not that set aside to Mrs. Lynch "instead of the annuity." The testator also declared that if this change, or substitution of productive real estate, to produce the annuity, instead of a sale to raise the $60,000, took place, it must be made by the consent of all the parties interested. We think that substitution or change was made by and with the consent of all the proper parties and those who were interested, by the suit in chancery above referred to; and that the fund or property set aside to produce that annuity, also for the shares of Mrs. Lynch and her three children, in the residuum of the estate, was properly set aside for those purposes, and we see no difficulty in now dealing with this whole fund to carry out the will of the testator and correctly adjust all the rights and equities of all the parties interested therein.

By reference to the testator's will it will be seen that if this arrangement for the substitution of productive real estate should be made, in lieu of the sale of other property and the creation and investment of the fund of $60,000, *then* the residue of his estate might be divided as above. It was the *residue* to be divided, not this real estate thus set aside, with the residue. If the money had been raised, then the residue of the estate, excluding the fund, was to be divided and distributed. The same language is used in reference to the substitution of productive real estate for the money, and the same consequence results in one case as in the other. We have seen that if the money had been raised, then the residuum was to be divided, one-eighth to the widow and one-eighth to each of the children, absolutely. If the substitution took place then what remained after setting aside sufficient real estate to produce the annuity, was to be divided " as above;" that is, in the same manner, and in the like proportions as if no such substitution or change had taken place.

The directions of the decree in chancery were that this fund

or portion of the estate, agreed upon by the parties to that suit to be ample and adequate, not only to raise the annuity to be paid to Mrs Lynch during her life, but also to place herself and her three children on an equality with the four sons in the distribution of the residue of the estate, should be held for the benefit of the said Jane Lynch, Louisa Lynch and James A. Hamilton, as assignee of Dominick Lynch and Dominick Lynch Lawrence, share and share alike. Assuming that we are correct in the view that a portion of this real estate was set aside in fact to produce sufficient to secure the annuity, then all that remained should have been divided between Mrs. Lynch and her children. But instead of doing this, that which was relied upon to produce the annuity was mingled with the share to which Mrs. Lynch and her three children were entitled, and the separation not having been made when it should have been, it must be made now. Mrs. Lynch and her three children, as to the residue of the estate, after setting aside that necessary to produce the annuity, were entitled to be placed on an equality with the four sons, James, Henry, Alexander and Edward. At the division in 1831, certain portions were assigned to the four sons. Amounts equal in value should have been given to Mrs Lynch and her three other children, and we can see no good reason why an entire separation and division should not have been made then. No embarrassment would then have ensued, and this litigation would never have arisen, if the other portions of the testator's will had been adhered to; that is, a separation of that portion of the estate conveyed to the trustees, under the decree in chancery, so that it might distinctly have appeared what was retained as needful to secure the annuity and what remained undivided constituting the shares of Mrs. Lynch and her three children.

She and they were entitled to have received on the division of the residue of the estate shares of equal value to those assigned and transferred to the four sons. All should have been placed on an equality. We think that it is safe to assume that sufficient of the estate was retained and conveyed to the trustees to have secured the annuity, and to have placed Mrs.

Bolton *v.* De Peyster.

Lynch and her three children on an equality with her four sons. A separation must be made, setting aside sufficient to place Mrs. Lynch and the three children on the same footing with the sons, and that division must be made as of 1831, at the time the sons received their share. Whatever remained of the estate must be deemed as retained to satisfy the annuity, and after it has fulfilled that office, it must be divided in accordance with the terms of the will, applicable to that fund. Upon these principles the plaintiffs would be entitled to one-sixth part of seven-eighths thereof, with the accumulations upon the death of Mrs. Lynch, deducting therefrom the annuity paid to her.

The judgment of the special term must be reversed and a judgment entered declaring the rights of the parties upon the principles of this opinion. A reference must be had, to ascertain the value of the shares transferred to James, Henry, Alexander and Edward, in 1831, and to allot and set off as of that date to Louisa Lynch, (from the property conveyed to the trustees pursuant to the decree in chancery,) in her own right and as devisee of her mother, two shares, each equal in value to the shares respectively conveyed to each son, and to allot and set off to the children of Dominick Lynch, another share of equal value to that of the shares respectively assigned to the other sons ; and that the same allotment be made to Dominick Lynch Lawrence ; and that of the residue of the estate so conveyed and held by the said trustees, with all the accumulations thereof, deducting the annuity paid to the said Jane Lynch during her life, the plaintiffs were entitled upon her death to the one equal sixth part of seven-eighths thereof.

The costs of all the parties except those of the defendant De Peyster, to abide the further order of the court. His costs and counsel fees are to be paid out of the funds in the hands of the surviving trustee.

MITCHELL, P. J. Dominick Lynch made his will in 1823, and died in 1825, possessed of a large real estate, but not of sufficient personal estate to pay his debts and to raise two legacies of $5000 each. He gave specific articles to his wife, and

then devised all the rest of his estate, real and personal, to trustees, in trust for the purposes hereinafter named. These were active trusts, and gave the legal title to the trustees. The trusts were, 1. To pay his debts; 2. To pay his widow an annuity of $3000; 3. To pay two legacies of $5000 each to each of his two children Louisa and Edward; 4. To raise the sum of $60,000 and invest it in mortgages, &c., and out of the income to pay the said annuity; and if the income should be more than enough for that purpose, to accumulate the surplus during her life. Then in the next item he says, " *after* the payment of my debts and of the said legacies, and *after* the said investment of $60,000 shall be made, I direct that all the residue of my estate real and personal shall be divided into eight equal parts;" and he gives, absolutely, one-eighth to his widow and her heirs, and one-eighth to each child of his and the heirs of such child; he having seven children then living. This gave vested interests in fee in that *residue* (whatever it meant) to the widow and each child—vested at the moment of the testator's death, and liable to pass to the issue of any child who should afterwards die, except by descent, devise or conveyance from such child. The grandchildren took no interest as "purchasers" or "*personæ designatæ*" in this residue. In the next item the testator directs that *after* the death of his wife "the one equal eighth part of the said sum of $60,000, with its accumulations, should be disposed of among any of his children or grandchildren as his wife should by will appoint; and in default of a full appointment it was to be divided "in the manner with" the rest of the said sum. He then gives one of the other seven-eighths, after the death of his wife, to each of his seven children; but if either child died before the testator's wife, the share of that child was to go to his child, if any, who should survive the widow. And if either child died before the widow, leaving no child, his or her share was to be divided among the children of the testator who should survive the widow, and the children surviving the widow, of any deceased child, *per stirpes.* By this provision a very different disposition of the $60,000 was made from that which was made in the

previous item, of the *residue* there spoken of. That (as was seen) passed a present, immediate absolute estate in fee to each child and to the widow. This, although it passed a present interest in a reversion to each child, yet made it liable to be defeated by his death before the widow, and thus postponed the absolute vesting of the title to any part of the reversion which it disposed of, until the *death* of the widow, and then gave it, not to any child of the testator who should die before the widow, but directly to the children of such child, if any, and if none, then to brothers and sisters surviving the widow, or the children so surviving of any deceased brother or sister. This shows that by the term "residue" in the previous item, was not included the reversionary interest in the $60,000, but that part of his estate was meant which remained, exclusive of the $60,000. He regarded the *investment* of the $60,000 in the same light as the *payment* of his debts and of the legacies. He uses the same term as to each—"*after* the payment of my debts and of the said legacies, and *after* the said investment of $60,000 shall be made, I direct that all the residue, &c. be divided." The debts and the legacies were to be first taken out of the estate before the residue was to arise. The $60,000 was likewise to be first taken out, and the *difference* only was the residue; especially as the income and the capital of that $60,000 were specifically disposed of, in a manner different from that residue. The investment was thus to be as a payment.

The testator, after giving various powers and directions to his executors, towards the close of the will, proceeds with the part which more directly causes the present controversy. He says, "My intention in directing the before mentioned *investment* of $60,000 is to provide, beyond the possibility of accident, for the punctual payment of the *annuity* to my dear wife during *her life*. I am aware that in order to raise this sum at once, a sacrifice may be necessary. Should, therefore, my wife be willing to accept, during *her life*, of certain parts of my *real estate*, which are now productive, instead of the *annuity*, such an arrangement may be made, and may be beneficial, and the *residue* of the estate may then be divided as

above directed. But nevertheless, if any arrangement or disposition of my property be made, different from that above mentioned, it must be by consent of all parties interested."

The testator does not give his wife a right to extinguish the fund out of which the annuity was to arise, by taking a sum in gross which should be in lieu of her interest in that fund, and should make the fund or its equivalent unnecessary. But he gives her an election coextensive exactly with her right in the proposed fund ; that is, " to accept during *her life*, of certain parts of his real estate, instead of the annuity." It was to accept of real estate during her life, and not lands in fee equal to the value of her life estate in the annuity ; to accept the real estate not in lieu of the capital fund which was to raise the annuity, but in lieu only of that which was to belong to her " instead of her annuity." To carry out the intention thus expressed, real estate in fee was first to be selected, and the widow was then (if she would) to accept it during her life only, instead of the annuity. This selection of real estate was to dispense with the investment, and was to be in place of it. The testator gave the election to his wife, not with a view to change any disposition of his estate which he had previously made, or to cut off or change the estates of any for whom he had before provided, but as he declares, only to prevent the sacrifice which might be necessary in order to raise this sum (the $60,000) at once, and to secure the punctual payment of the annuity to his wife. He connects, also, the substitution of the real estate with the investment of the $60,000, by introducing the subject with the declaration as to what his intention was in directing the before mentioned investment of $60,000. There is no *express* declaration that the $60,000 was not to be invested, even if she should accept real estate for life ; but there is an implied declaration that it shall not be raised if its equivalent is raised. That equivalent would be so only if it was preserved for the same purposes for which the fund was to be raised. The testator, after thus allowing his wife to accept certain parts of his real estate for life, instead of the annuity, says " the *residue.* of the estate may *then* be divided as above directed." This was a divis-

Bolton *v.* De Peyster.

ion to be made in the lifetime of his wife, and he had directed but one division to be made during her life, and that was of a *residue* exclusive of the $60,000. He had thus (as has been said in another case on wills) become his own lexicographer ; he had defined what he meant by the "residue of my estate" or "the residue of the estate" as connected with this investment or with the fee simple estate which was to be its equivalent ; it was that which remained after excluding the capital or the fee simple. This best corresponds also with the exact meaning of the words "the residue of the estate may then be divided as above directed." What does "above directed" refer to ? or what does "directed" agree with ? It is the residue ; then this residue is to be divided as it is above directed to be divided ; and the residue above directed to be divided does not include the capital from which the annuity was to arise ; so neither does this residue include the reversionary interest in the lands in which the widow was to have a life estate.

What, however, was to be the effect of this substitution ? It was to supersede that in whose place it was to come, and the rights of all parties were to be in the land as otherwise they would have been in the moneyed fund. For this reason the testator required that if made "it must be by the consent of all parties interested ;" thus securing the watchfulness of self-interest in the selection of the lands. The children of the testator had a present interest in the fund or its substitute, but liable to be defeated in case of their death before the death of the widow. It was such an interest, that they (being certainly designated) could dispose of it by warranty, and their conveyance would be valid if they should survive their mother. As remarked also in an opinion in this case by our lamented associate, Edwards, the selection of the lands was to be made (if ever) in the lifetime of the widow. It might be made the year or the day after the testator's death, while all the children of the testator were living. The will must therefore have meant by the expression "the consent of all parties interested," those who had such interest at the death of the testator ; and that was his children. The testator had created the interest,

of all the parties, and for the sake of saving his estate from a sacrifice and the better securing a support to his wife, which was the great object of his heart, had authorized her to accept a subsituted security in lands, with the consent of all the parties interested. To give any effect to this authority, he must have meant to require the consent of those only who were capable of giving a consent, when he intended the authority to be exercised; and he must have intended to include among those who were interested, only those who when the power was to be exercised should be in existence, not those also who might afterwards come into being. A different construction would utterly defeat one of his great objects.

This view of the will would sustain any appropriation of lands made to provide for the annuity if it should appear that any had been made; whether it were equal or unequal, if it were not fraudulent; and answers the objection of the plaintiffs that the appropriation of the lands was not made with the consent of grandchildren then unborn.

There is no allegation of fraud, in the complaint, either as to the decree obtained in 1831 on the application among others of the father of some of the plaintiffs, or as to any other matter. There is no proof of any; and there is no reason for imputing any. The omission in the complaint on which that decree was obtained of part of one clause in the will was evidently an accident on the part of the copyist. This may perhaps be more readily assented to, if it should turn out that no attempt was made in that suit to affect the rights of these plaintiffs. It is necessary now to refer to it.

James Lynch and Henry Lynch had each become embarrassed, and had been compelled to make an assignment of their property. It may be inferred that they wished to have their share of their father's estate set aside to them in severalty, that they might use it to obtain settlements with their creditors. They had no interest to make their shares either larger or less than they actually were. Their creditors would probably settle on getting all that they had, and would not for less. Their feeling might be, therefore, to give to their own children; certainly

not to take from them and give to their brothers and sisters. They accordingly joined with others, in 1829, in filing a bill in chancery against the executors of their father's will and Dominick Lynch Lawrence, the infant son of a deceased daughter, and the United States district attorney as representing the United States, a creditor of Henry, and prayed for a division of the estate. The parties submitted to the master an agreement for a division, in which all joined, except that the executors only expressed their opinion in its favor, and their willingness to execute it under the direction of the court. The master approved of the agreement, and the court by its decree ratified it. It set apart to James, or his assignee, his separate share; to Alexander his; to Henry, or his assignee, his; and to Edward his. The rest of the estate real and personal the agreement and the decree declared " should be united in one undivided share or interest, subject to the *payment of the annuity to Jane Lynch* mentioned in *the pleadings*, and to an annuity to Lewis Sibourd, and to the residue of a debt to the executors of A. H. Lawrence, and to $4000 to Alexander Lynch on the death of Sibourd or of Jane Lynch; and also subject to all other claims upon the said estate, including taxes, assessments and other charges against such parts of the estate as were included in the shares of James, Alexander, Edward and Henry, and which accrued prior to the 25th of June, 1829, and thus subject, it was to be for the benefit of Jane Lynch, Louisa Lynch, James A. Hamilton as assignee of Dominick Lynch, and Dominick Lynch Lawrence, share and share alike.

The bill had stated that the widow was willing to consent to an arrangement by which she would dispose of certain parts of said real estate during her life instead of the annuity, and that it would be convenient that the lands now in question, those in the neighborhood of Rome, should remain undivided, and that those who should become interested in those lands should have their interest therein undivided "and subject to the payment of the annuity to the said Jane Lynch and to the payment of the *debts* due by the estate."

They did not, therefore, file their bill to defeat any rights of

Bolton *v.* De Peyster.

grandchildren, but simply to obtain their separate shares of the estate. The bill assumed, and all parties probably thought that the widow might elect to have her annuity secured upon lands, and that then it would not be necessary to raise the $60,000. But they did not seek in their complaint, or in the decree, any opinion or decision on that point. They did seek in both, that the annuity for the widow should be charged on the lands now in question, but not that the $60,000 should be charged on them. The decree was made accordingly, and the widow received her annuity of $3000 per annum regularly during her life, out of those lands.

What was the whole effect of the decree? There were eight persons equally entitled to the estate out of which the sum of $60,000 was to be raised at some time; they supposed that all they were bound to raise was interest on that sum at the rate of 5 per cent per annum, during the life of the widow; they provided fairly for this interest or annuity, and for it only, and made it alone a charge on the lands of four of them; but as the court now hold, the land of each distributee should also have been made subject to pay its one-eighth part of the principal sum of $60,000. Each distributee or his share should now be made to pay that one-eighth and no more. If there may be circumstances which would make the shares of the widow and her three children holding in common with her liable for the whole, they have not been alleged or proved.

The widow was entitled to one-eighth of the estate in fee and she had a power to dispose of the one-eighth of the $60,000 by will to any of her children or grandchildren. She made her will giving all her estate real and personal to her daughter Louisa. By the revised statutes (1 *R. S.* 737, § 126,) "lands embraced in a power to devise shall pass by a will purporting to convey all the real property of the testator, unless the intent that the will shall not operate as an execution of the power shall appear, expressly or by implication." This clause was introduced to put an end to the uncertainties previously existing whether a power was intended in each particular case to be exer-

Bolton *v.* De Peyster.

cised or not. It lays down a clear rule, which (I am of opinion) the courts must apply also to personal estate.

One child of the testator died without issue, before the widow. The result would be, that the lands assigned to the widow and her three co-tenants would be liable to pay half of the $60,000 and interest from her death; that her devisee and legatee, Louisa, would be entitled to one-eighth of that half; and that the other seven-eighths of that half would be distributable in equal one-sixth parts to Louisa, and to each of the other surviving children of the testator, and the surviving issue of any deceased child, (*per stirpes.*)

The claimants of the $60,000 would not be entitled to an account of any accumulation of income from the $60,000, beyond the $3000 per annum, as that accumulation was only to take place and the accounting to be made, if the $60,000 had been raised and invested and produced more than $3000 per annum; or lands had been set apart separately to secure the annuity, with the like result. No such fund of $60,000 was raised. No lands were separately set apart for such a purpose.

This is peculiarly just; as the intention of the testator was to raise only the $3000 per annum; and if lands were set apart sufficient for that purpose, that was all that the will required or justified. In thus setting apart lands, there would necessarily be some excess beyond, or falling short of, the exact value; and there would afterwards be some appreciation or depreciation in such value. So also there would be some excess or falling short of income. The reversioners were to have the benefit of the excess, and must have borne the loss, so far as the fee was concerned, but this excess or loss was as an accident, not as a thing designed by the testator.

The above mode of distributing the $60,000, is based on the complaint as it now is, and the proofs in the cause. The order to be entered should be without prejudice to the right of the plaintiffs to move by amendment or otherwise, to present such a statement of facts and such proofs (if they exist) as would throw a great portion of the charge of $60,000 upon the defendants' shares of the estate.

The costs and counsel fees of all parties should be paid out of the fund, as the controversy has been fairly conducted, and arose out of the construction of that part of the will relating to that fund only, and neither party succeeds entirely.

[NEW YORK GENERAL TERM, November 2, 1857. *Mitchell, Roosevelt* and *Davies*, Justices.]